IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANILO VELASQUEZ, *et al.*<br><br>Defendants.<br>_____/ | No. CR 08-0730 WHA<br><br>**ORDER DENYING DEFENDANT VELASQUEZ'S MOTION TO SUPPRESS STATEMENTS** |

**INTRODUCTION**

Defendant Danilo Velasquez moves to suppress statements made to Daly City Police Department Detectives Gregg Oglesby and Detective Albert Cisneros (Dkt. No. 4443). After full consideration of the parties' submissions, oral argument at the hearing on the motion, the video of the interview, and the testimony of Detective Oglesby, Certified Court Interpreter Conchita Lozano, and Investigator Jake Bergman at the evidentiary hearing, the motion is **DENIED**.

**STATEMENT**

In this RICO/VICAR gang prosecution, the third superseding indictment charges defendant Danilo Velasquez of RICO conspiracy, conspiracy to commit murder in aid of RICO, and conspiracy to commit assault with a dangerous weapon in aid of RICO. To prove up these charges, the government intends to show that defendant was the shooter in the February 2009 Daly City BART shooting which killed Moises Frias and injured three others.

In conjunction with the investigation of the Daly City BART homicide, defendant was arrested by SFPD officers on July 8, 2009. After his arrest, he was transferred to the custody of the Daly City Police Department and was interviewed by Detective Gregg Oglesby and Detective Albert Cisneros. Detective Oglesby took the lead in asking questions while Detective Cisneros translated from English to Spanish and Spanish to English.

The detectives *Mirandized* defendant multiple times. At the outset of the interview, the detectives informed the defendant of his right to remain silent, his right to an attorney during questioning, and the right to have an attorney appointed if he could not afford one (Tr. 10–11). When asked if he understood these rights, defendant responded, "Where am I going to get money, if I don't even have any to eat?" (Tr. 11). In response, the detectives again explained that defendant could have an attorney appointed for free to represent him. After repeating defendant's rights to him, the detectives asked defendant if he understood the rights as explained and defendant answered "yes" (Tr. 14).[1]

Before detectives commenced substantive questioning, however, defendant inquired, "[I]s it necessary for me to have an attorney regarding this?" Accordingly, the detectives did not commence questioning and instead again advised defendant that he had a right to an attorney "at any opportunity" he wished. Defendant then asked: "But, I can have, have an attorney right now, if I can talk, or how?" Detective Cisneros asked defendant to restate his question ("Excuse me?") and defendant asked, "If, if I can have speak, attorney right now to be able to speak with you?" Detective Oglesby understood defendant to be asking for advice as to whether or not he *should* obtain a lawyer, rather than whether or not he had the right to obtain a lawyer (Hrg. Tr. 42).[2] In response to defendant's inquiry, the detectives reiterated multiple times that they would not talk about the case that morning if defendant did not wish to (Tr. 15–17). The detectives further explained that if defendant did not wish

---

[1] References to "Tr." are references to the transcript of the July 8 interview submitted by the defense. For purposes of the instant motion, the government does not contest the accuracy of the transcription and translation.

[2] References to "Hrg. Tr." are references to the transcript of the evidentiary hearing (Dkt. No. 5126).

2

to speak with them, he would be transferred to the county jail, and would thereafter be appointed an attorney. Detective Cisneros then repeated defendant's *Miranda* rights and inquired whether defendant was willing to talk about the charges and the reason why there was an arrest warrant out for him (Tr. 17–18). Defendant answered, "Yes, because I don't owe anything," by which he meant, "Yes, because I don't owe anybody anything."[3]

The detectives then interviewed defendant regarding gang membership, his relationships with suspected gang members and individuals alleged to have been involved in the Daly City homicide, his involvement in the homicide, his possession of a firearm, and his cell phone number. During the interview, defendant did not invoke his right to remain silent or right to counsel. Questioning of defendant lasted approximately three and a half hours. A viewing of the entire video shows that defendant was cogent and appropriately responsive in the long interview.

**ANALYSIS**

**1.    WAIVER OF *MIRANDA* RIGHTS**

Inculpatory statements made by a defendant during a custodial interrogation are only admissible if the defendant made a voluntary, knowing and intelligent waiver of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A waiver is knowing and intelligent if under the totality of the circumstances the defendant was aware of the "nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127, *amended*, 416 F.3d 939 (9th Cir. 2005) (citations omitted). The voluntariness of a waiver depends on the absence of police overreaching, not on "free choice." *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception . . ."). There is a presumption against

---

[3] Later in the interview, defendant stated, "Often they hit me, often they shoot at me, over there, it's like I owe something to the people" (Tr. 152). This is the only other reference during the interview to defendant "owing" something.

3

waiver and the government bears the burden of proving waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Here, the transcript and video of the interview make clear that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. There is no indication that the detectives intimidated, coerced, or deceived him into expressing a desire to speak with them.[4] The detectives repeatedly advised defendant of his rights and did not begin questioning until he affirmatively stated "yes" in response to their inquiry of whether he was willing to speak with them and explicitly waived his rights. Indeed, the detectives patiently explained and re-explained defendant's rights and on several occasions rebuffed defendant's request to have a substantive discussion prior to the *Miranda* waiver (Tr. 9, 12–13, 15).

In any event, there was also an implied waiver of defendant's *Miranda* rights. Defendant affirmed that he understood his *Miranda* rights and thereafter proceeded to answer the detectives' questions. *See Rodriguez-Preciado*, 399 F.3d at 1127.

Defendant now argues that although he stated he understood his rights and stated he was willing to speak to the officers, the totality of the circumstances demonstrates that he did not knowingly and intelligently waive his rights. Specifically, defendant asserts that his lack of advanced Spanish-language skills and inability to understand sophisticated concepts, as well as an alleged head injury, precluded him from making a knowing and intelligent waiver. A review of the interview video makes clear, however, that defendant did not have trouble understanding the officers' inquiries and responding to them.

*First*, throughout the approximately three and a half hours of the interview, defendant did not appear to have any difficulty understanding Detective Cisnero's Spanish-language translations and at no point expressed an inability to understand any words or phrases. This comports with the fact that defendant has spoken Spanish since he arrived in the United States approximately 18 years ago. Although Investigator Bergman and Certified Court

---

[4] Defendant's argument regarding the officers' compliance with Article 36 of the Vienna Convention on Consular Relations was not raised until defendant's reply brief and will not be considered (Reply 8).

4

Interpreter Lozano both testified that defendant has difficulty with verb tenses and verb conjugation, these purported language-skill deficiencies speak to defendant's ability to speak "properly" rather than his ability to understand the Spanish language.

*Second*, the interview video makes clear that no mental deficiency prevented defendant from understanding the detectives. The defendant did not express confusion — either explicitly or through body language — when listening to or responding to questions. Nor has competent evidence been introduced that defendant was mentally incapable of following the discussion at the time despite his outward appearance that he understood what was happening.[5] Moreover, defendant had prior experience with the criminal justice system — as he had been arrested on two prior occasions — a factor which weighs in favor of finding he understood his rights. *See United States v. Glover*, 596 F.2d 857, 865 (9th Cir. 1979). The only evidence in the record that supports defendant's claim that he did not understand his rights is his own litigation declaration (Velasquez Decl. ¶ 17). The ground rule is, however, once an evidentiary hearing is held, the testimony subject to cross-examination is considered — not the untested declarations. At all events, the Court finds the actual video of the interview (which indicates defendant understood his rights at the time) to be a more reliable piece of evidence than defendant's declaration. The contested claims in defendant's declaration were not subject to cross-examination and the declaration was authored almost two years after the events in question. In contrast, the interview video recorded the events as they occurred and neither party disputes its accuracy.

*Third*, the video makes clear that any injuries sustained by defendant during his arrest did not interfere with his ability to understand and respond to what the detectives were saying. Defendant's demeanor and answers to the detectives' questions were responsive and appropriate and did not indicate he was in pain, overwhelmed, or tired. Additionally, although defendant asserts that he slept at some point while in the interview

---

[5] Defendant's demeanor during the interview indicates that his statements regarding his life being worth "nothing" and his indifference to being killed were expressions of sadness or frustration, not confusion.

5

1  room, Detective Oglesby testified that defendant did not fall asleep at any point during the
2  questioning and the interview video submitted to the Court does not show defendant
3  sleeping (Velasquez Decl. ¶¶ 14, 17; Tr. 46).
4      The totality of the circumstances do not counsel in favor of finding defendant's
5  explicit and implicit waivers were not knowing and intelligent.

### 2. INVOCATION OF RIGHT TO COUNSEL

7      Once a defendant invokes his right to counsel, all questioning must cease. *Edwards*
8  *v. Arizona*, 451 U.S. 477, 484–85 (1981). Whether a suspect has invoked the right to
9  counsel is an objective inquiry and a defendant's words are to be taken "as ordinary people
10 would understand them." *See Davis v. United States*, 512 U.S. 452, 458–59 (1994); *United*
11 *States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992). *Defendant did not invoke his right*
12 *to counsel*. Here, defendant's questions about his entitlement to counsel were questions for
13 further information about *whether* he should invoke his right and the *logistics* of obtaining
14 counsel — not an invocation of his right to counsel.
15     Defendant first asked the detectives: "[I]s it necessary for me to have an attorney
16 regarding this?" An ordinary person would have understood this question to be the result of
17 defendant weighing his options rather than asking for clarification because he did not
18 understand the extent of his rights. Instead of advising defendant of what he should do
19 (which would have been inappropriate), the detectives re-stated that defendant had the right
20 to an attorney "at any opportunity" he wished. In response, defendant asked: "I can have,
21 have an attorney right now, if I can talk, or how?" After being asked to repeat his question,
22 defendant asked: "If, if I can have speak, attorney right now to be able to speak with you?"
23 Neither question was a clear invocation of the right to counsel. A reasonable interpretation
24 of the inquiry was that defendant was seeking to discover *how quickly* he would be able to
25 speak with appointed counsel. A request for further information about the logistics of how
26 an attorney will be appointed and the timing of the appointment is not an invocation of right
27 to counsel. *See, e.g., Paulino v. Castro*, 371 F.3d 1083, 1088 (9th Cir. 2004) ("Where's the

6

attorney" and "[y]ou mean it's gonna take him long to come?" not unambiguous requests for counsel); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) ("What time will I see a lawyer?" not an unambiguous request for counsel).

At best, defendant's statements were ambiguous as to whether he was invoking his right to counsel. Where it is ambiguous if a defendant is invoking the right to counsel, questioning may proceed so long as it is limited to a clarification of whether the defendant is invoking his rights. *See United States v. Rodriguez*, 518 F.3d 1072, 1080 (9th Cir. 2008). Here, the detectives indeed limited further discussion to a clarification of defendant's right to counsel in a way that was responsive to defendant's questions about his right. The detectives explained that defendant was not required to talk to them that morning and if he did not want to speak with them, he would be appointed an attorney after being booked into county jail and going through the court process (Tr. 14-16). *Detective Cisneros then re-stated all of defendant's Miranda rights*. After the detectives responded to defendant's inquiry, defendant then stated he was willing to speak to them at that point in time. The commencement of substantive questioning after that point was proper.

## CONCLUSION

The motion to suppress defendant's statements to Detectives Oglesby and Cisneros on July 8, 2009, is **DENIED**. The statements were not elicited in violation of *Miranda* and will not be suppressed.

Dated: September 28, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE